## Lant's Appeal.

1. In equity where a person has a legal right to dispose of property and intends to do so and the instrument to carry out this intention is at law ineffectual, the courts will regard it as reformed and decree it to be such as it ought to have been to effectually carry out said intention.

2. A woman in contemplation of marriage obtained from her intended husband his verbal consent that she should dispose of her property by will or otherwise as she pleased. The day before her marriage she executed a will whereby she made a liberal provision for her husband and gave the residue of her estate to relatives, friends and charities: *Held*, that while said will was revoked by her subsequent marriage, by reason of the Act of April 8th 1833, it might, nevertheless, take effect in equity as an ante-nuptial settlement, and that on every principle of equitable estoppel the husband's mouth ought to be shut from interposing an objection to its full enforcement.

| 95 | 279 |
| 164 | 522 |
| 95 | 279 |
| 174 | 448 |
| 95 | 279 |
| 196 | 487 |
| 95 | 279 |
| 217 | ¹206 |

June 23d 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, TRUNKEY, STERRETT and GREEN, JJ. PAXSON, J., absent.

Appeal from the Orphans' Court of *Lancaster county*: Of May Term 1880, No. 198.

Appeal of Julia M. Lant from the decree of the court dismissing her exceptions to the report of the auditors appointed to distribute the estate of Elizabeth M. Mullen, deceased.

The deceased, Elizabeth M. Dunn, who was a maiden lady of considerable wealth, in 1875 agreed to marry John A. Mullen, and February 9th 1876 was fixed as the day for the marriage. In December 1875 Mullen called upon Mrs. Dunn, the mother of the deceased, and asked her consent to the marriage, saying, "I don't want her money, I only want herself." Mrs. Dunn then gave her consent to the proposed marriage. About a week before the date fixed for the marriage, Miss Dunn sent for Judge Livingston to write her will for her. He informed her "that she could not make a will then or dispose of any of her property without the consent of and power and authority from her intended husband," to which she replied: "I will see Mr. Mullen, and if I get it fixed as you have stated I will send for you again." A day or two before the marriage she again sent for the judge and told him that her mother had first spoken to Mr. Mullen, and that he had expressed himself to her mother as being perfectly satisfied with anything she would do with regard to her property. She then said, "I then spoke to him and told him what I wanted to do, and the whole thing has been arranged as you said it should be, and Mr. Mullen is perfectly satisfied, and now I want you to write my will for me." On the day before the marriage, in the forenoon, Miss Dunn asked her mother to speak to Mullen, and ask if he was satisfied for her to dispose of her effects. In pursuance of this request Mrs. Dunn saw Mullen, and asked him "if he was satisfied for her to dispose of her effects," and he said "he was perfectly satisfied." Mrs. Dunn told her daughter what he said. Lizzie then wrote out

[Lant's Appeal.]

the items of disposition of her estate, intending to get Judge Livingston to write them out in the form of a will. After writing down the disposition she desired to make of her estate, Lizzie again said to her mother : " Now I have the items wrote out, and I want you to speak to John again and ask him if he isn't satisfied." Mrs. Dunn said : " Lizzie, did you not speak to him yourself?" Lizzie said, " Yes, but I want you to talk to him again, and if he is not satisfied I won't marry him." The same evening Mrs. Dunn told him " Lizzie wanted her to ask him if he wasn't satisfied that she should dispose of her fortune, by will or any way she pleased;" and he said, " yes, I am satisfied for Lizzie to dispose of her fortune, by will or otherwise, any way she pleases." Just as they stopped talking Judge Livingston came in and laid a paper down on the table, and Mullen asked Mrs. Dunn " if there was any paper he was wanted to sign." Then Lizzie came into the parlor, and Mrs. Dunn, being called into the dining-room, left Lizzie, Mr. Mullen and the judge together in the parlor. The judge read the paper over to Lizzie item by item. She said it was just as she wished it. Mr. Mullen said he was going down street and would be back shortly. This was before the paper was signed. Lizzie said to him, " I am about signing" or " executing the paper we spoke of," and Mullen replied, " O! very well," or " very well," and, closing the door, went out. He did not see the paper, which was taken by Judge Livingston, and kept by him at his office until after the death of Mrs. Mullen.

On February 9th 1876, Elizabeth Dunn was married to Mullen, and in August following became very ill. During this illness Mullen had a conversation with Rev. Michael J. McBride, wherein he complained that he was treated badly by the family of his wife, and that " they had made a will without consulting me." Father McBride said, " John, didn't you give your consent before the marriage," and Mullen replied, " Yes ; but they should have had it in writing. A verbal consent will not hold in law." On August 26th 1878, Elizabeth Mullen died without children, and a few days thereafter the above-mentioned paper, which was executed on February 8th 1876, was admitted to probate as a will, and letters testamentary were granted by the register of wills of Lancaster county to the executors named therein. On September 3d 1878, John A. Mullen filed a petition with the register, praying to have said probate and letters testamentary vacated and annulled, on the ground that the said will had been revoked by the marriage of the testatrix subsequent to the execution of the alleged will. The executors named therein filed an answer, and the register refused the prayer of the petition. An appeal was taken to the Orphans' Court, which made a decree granting the prayer and vacating the probate and letters testamentary. Letters of administration were then granted on the estate of the deceased, to her

[Lant's Appeal.]

husband, John A. Mullen, who filed his account May 15th 1879, showing a balance in his hands of $76,646.89. The sister of the deceased, Julia M. Lant, filed exceptions to this account, and on July 3d 1879, the Orphans' Court referred the matter to auditors to pass upon the exceptions and distribute the balance in the hands of the administrator.

The auditors, inter alia, reported: "From the evidence we find that John A. Mullen, before the marriage, assented or consented that his intended wife might make a will; that she did make a will—the paper produced before the auditors; that John A. Mullen did not know its contents, and that there was no ante-nuptial contract between Elizabeth M. Dunn and John A. Mullin, or marriage settlement of her separate estate. This will having been revoked by her subsequent marriage (Act of April 8th 1833, sect. 16), the balance in the administrator's hands must be distributed in accordance with the provisions of the intestate laws of this Commonwealth." And they then awarded the whole balance for distribution, $75,538.33, to Mullen.

To this report Julia M. Lant filed exceptions, alleging that the auditors erred, inter alia, in not finding as a fact, under the evidence produced, that there was an ante-nuptial contract or agreement between Elizabeth M. Dunn and John A. Mullen with regard to the disposition of her separate estate based upon a valid and valuable consideration; and in awarding to John A. Mullen the whole balance in his hands as administrator.

The court, Patterson, A. L. J., dismissed the exceptions and confirmed the report, whence this appeal.

*H. M. North, S. H. Reynolds* and *P. D. Baker,* for appellant. —Almost any bona fide and reasonable agreement, made before marriage, to secure the wife either in the enjoyment of her own property or a portion of that of her husband, whether during coverture or after his or her death, will be carried into execution in chancery: Stilley *v.* Folger, 14 Ohio St. 610; 2 Kent Com. 163; English *v.* Foxall, 2 Pet. 595; Hunter *v.* Bryant, 2 Wheat. 32; Tarbell *v.* Tarbell, 10 Allen 278; Smith *v.* Chappell, 31 Conn. 589. Such an agreement will be enforced in favor of collateral relatives: Neves *v.* Scott, 9 How. 196; s. c. 13 Id. 268. With respect to form, equity pays no regard to externals, but considers only the substantial intention of the parties: Peachey Mar. Settl. 65; Macq. Husband and Wife 242; Acton *v.* Pierce, 2 Vern. 480; Crostwaight *v.* Hutchinson, 2 Bibb 407; Siles *v.* Fleming, 1 Dev. Eq. 185; Kenly *v.* Kenly, 2 How. (Miss.) 751; Logan *v.* Weinholt, 1 Cl. & Fin. 611; Hammersley *v.* DeBeil, 12 Id. 45; Moorhouse *v.* Colvin, 15 Beav. 349. A parol ante-nuptial settlement by which the husband and wife agreed that the wife's chattels should continue her own notwithstanding the marriage, and

they were so treated by him during the marriage, is binding at the decease of either or both, and the husband has no right of survivorship, nor does the intestate law affect them : Gackenbach v. Brouse, 4 W. & S. 546 ; Barnes v. Irwin, 2 Dallas 199.   The auditors having found that Mullen had consented that his intended wife might dispose of her property as she pleased, committed a palpable error when they failed to give it the effect of a contract.   It was not material whether she called the paper a will, deed, indenture, power of attorney, sketch of will, or any other name, it embodied the intention of the parties, and should have b'een executed in equity as the evidence of that intention.   Mullen induced his wife to enter into the marriage relation by his representations that he was willing she should dispose of her property as she pleased, and he should be bound thereby : Mowry v. Jordan, 15 Beav. 377 ; Pulsford v. Richards, 17 Id. 94 ; Bold v. Hutchinson, 20 Id. 259 ; Peachey on Marriage Settlements 87.

*Richard P. White* and *Thomas E. Franklin,* for appellee.—If the paper executed by Mrs. Mullen operated as a will, it was, whether made with the consent of the husband or not, revoked by the subsequent marriage, by reason of the provisions of the Act of April 8th 1833, sect. 14, Pamph. L. 250.   But an agreement is attempted to be set up, made by Mr. Mullen verbally before marriage, the effect of which is claimed to be to sustain the validity of the will, notwithstanding the subsequent marriage, and the case of Gackenbach v. Brouse, cited and relied on by appellants, as recognising the validity of such an agreement when clearly and satisfactorily established.   That was a case of mutual agreements, by which each party agreed that they would each retain their own property.   It was decided before the Act of 1848, and was placed on the ground that the provisions of the intestate law were not designed for a case where the course of the property at the wife's death was marked out by a settlement.   But in this case the proof falls far short of showing anything in the nature of an agreement on Mr. Mullen's part as to the disposition of her property after her death in case she died intestate.   It amounts to nothing beyond his assent that she should make a will, or that she might dispose of her estate as she chose, and it is not nearly so strong a case as Fransen's Appeal, 2 Casey 202, or Kurtz v. Saylor, 8 Harris 205. See also Talbot v. Calvert, 12 Id. 327.

Chief Justice SHARSWOOD delivered the opinion of the court, October 4th 1880.

There are some matters involved in this controversy which must be assumed if not conceded as not in dispute.   First, that the instrument purporting to be the last will and testament of Elizabeth M. Dunn, dated February 8th 1876, cannot take effect as a

will, having been revoked by her marriage with the appellee on the following day. Probate of it was refused by the tribunal having exclusive jurisdiction as far as personal property is concerned, and its decree unappealed from is conclusive. Second, this revocation was by the positive provision of the statute 8th April 1833, sect. 14, Pamph. L. 250, "A will executed by a single woman shall be deemed revoked by her subsequent marriage." This law was not known to her and not adverted to by her counsel called in by her to give his advice and prepare the instrument. It was certainly not thought by her that such a result would follow. She did not mean it to be revoked by her marriage. On the contrary, both she and her counsel meant to make a disposition which would be effectual after the marriage which was to be celebrated within twenty-four hours after the paper was executed. The execution of the will at the time and under the circumstances was a plain mistake. Had it been postponed only a few hours until after the marriage ceremony was performed it would have been a valid and effectual disposition of her property. Third, there was a contract made by John A. Mullen, the intended husband, at or about the time the instrument was executed, by which she was to have the power "to dispose of her fortune by will or otherwise any way she pleased." That this was the contract is established by the most conclusive testimony, confirmed by the admission of the husband afterwards, who put his refusal to give effect to it not on the ground that he had not freely and fairly so agreed, but that because it was not in writing he was not bound by it. In this he was mistaken, for a parol ante-nuptial contract such as this, being in consideration of marriage, which is a valuable one, is unquestionably binding on the parties: Gackenbach v. Brown, 4 W. & S. 546. That he knew and considered at the time the instrument in question was executed, that it was intended to carry out and give effect to his ante-nuptial agreement, is proved by the clearest and most convincing evidence.

If, as it has been earnestly contended, the decree of the court below must be affirmed, and the entire personal estate of the decedent awarded to the appellee, then it is not to be disputed that there must be some palpable defect in equitable jurisdiction in this Commonwealth to render necessary so gross an injustice, so revolting to the moral sense of what is right and wrong. We think, however, that fortunately there are two very familiar and well settled principles of equity often recognised and applied by our courts which prevent such a result. One of these principles is, that whatever a chancellor on the facts of a case would have decreed to be done the courts will consider as having actually been done. Another principle is, that wherever a person has the legal right to dispose of property and means to do so, the form of the

instrument adopted for the purpose, if at law ineffectual, will be disregarded, and it will be reformed so as to be made effectual.

Suppose then that at the time the paper of February 8th 1876, was executed by Elizabeth M. Dunn, she had filed a bill in equity setting forth the ante-nuptial contract made by John A. Mullen and the marriage about to be solemnized and praying that it might be carried into execution by some instrument of writing to be signed by him, what would have been the. decree of the court? Surely upon the undisputed facts the prayer of the bill would have been granted, and the decree would have been either that the husband and wife should join in a conveyance to trustees in trust for the separate use of the wife with full power in her to dispose of the same in her lifetime by sale or gift, and after her death by a will in writing or any writing in the nature of a last will and testament. Such is the ordinary form of such powers in marriage settlements. If the complainant was willing the court might decree simply that the husband himself should execute a declaration of trust to the same effect. Nothing is better settled than that a court of equity in decreeing the specific performance of marriage articles will make such a decree as will give full effect to the intention of the parties without. regard to the legal construction of the words used in them. Thus, if by the words according to their legal construction, a fee-tail would be vested in the parties or either of them, a strict settlement will be decreed to the husband or husband and wife for life, with remainders to the children of the marriage—successively in tail—according to the most approved forms of deeds of marriage settlement: 2 Story's Eq. Jur. sect. 983, and authorities there cited. Now if we are to consider as having actually been done what a chancellor would have decreed to be done, then we have at the time of the execution of the paper of February 8th 1876 either a conveyance to a trustee or a declaration executed by the husband to the same effect. Surely, then, under such a declaration or deed of settlement this paper, though ineffectual as a will under the statute, was still a writing in the nature of a last will and testament, a clause introduced into such powers for the very purpose of providing against mere technical objections, which would prevent the instrument from being admitted to probate as a will. It was a disposition of property to take effect at death if not revoked by the party during life. That is a writing in the nature of a last will and testament. This paper was so intended beyond all question. It was executed under and in pursuance of the contract on the eve of the marriage—indeed it might almost be said to have been in the consideration of equity cotemporaneous with the ceremony— executed for the express purpose with the knowledge and consent of John A. Mullen of having just the effect here stated. It makes most liberal provision for him and upon every principle of equitable

[Lant's Appeal.]

estoppel his mouth ought to be shut from interposing an objection to its full enforcement.

The case, too, is equally within the second principle of equity adverted to ; a paper executed by a person who had a perfect legal right to dispose of her property, and intended to do so, but by a plain mistake of the scrivener it was drawn in the form of a will when it ought to have been a deed or declaration of trust.   Surely it must be in the power of a court of equity in this Commonwealth to correct so gross and palpable a mistake, to reform the instrument and decree it to be such as it ought to have been, so as effectually to carry out the intention of the parties.

> Decree reversed and record remitted to the Orphans' Court of Lancaster county, that distribution may be there made according to the principle of this opinion, the costs of this appeal to be paid by the estate.