### IN

# THE SUPREME COURT

### OF

# PENNSYLVANIA.

## EASTERN DISTRICT—PHILADELPHIA, 1888.

## FIDELITY INS., TRUST, & S. D. CO.'S APPEAL. ESTATE OF GEORGE WHITNEY, DECEASED.

| 121 | 1 |
| 209 | 462 |
| e209 | ²464 |

APPEAL FROM THE DECREE OF THE ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued January 20, 1888—Decided October 1, 1888.

1. Section 15, of the Wills act of April 8, 1833, P. L. 249, providing that "When any person shall make his last will and testament and afterwards shall marry . .   . . and die leaving a widow . . . . . every such person, so far as shall regard the widow, . . . . . shall be deemed and construed to die intestate," etc., is an enabling act, intended for the benefit of the widow and to be construed liberally in her favor.
2. The section being for the benefit of the widow in case of an antenuptial will, it does not revoke the provisions of the will as to her, but she is left to accept its benefits or the benefits of the intestate laws at her option, especially in view of the provisions of § 11, act of April 11, 1848, P. L. 537 : Edwards' App., 47 Pa. 144, and Walker v. Hall, 34 Pa. 483, distinguished.
3. A testator bequeathed the one half of his residuary estate to his betrothed, whom he married five days after the execution of his will. He subsequently died without issue of the marriage : *Held,* that by the marriage the will had not been revoked as to the widow and that she was entitled to take under the provisions thereof.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

VOL. CXXI—1 (1)

No. 200 July Term 1887, Sup. Ct.; court below, No. 397 April Term 1885, O. C.

On March 17, 1887, the second account of Mrs. Sarah F. Whitney and A. E. Outerbridge, Jr., administrators c. t. a. of the estate of George Whitney, deceased, was called for audit, when the facts out of which the contention arose were agreed by the parties in interest to be as follows :

George Whitney, the decedent, being about 40 years of age, and about to be married to Miss Sarah C. Fairman, on January 20, 1859, made his last will and testament in the words following :

I hereby bequeath my sister-in-law, Sarah Stowe Ely, the sum of five thousand dollars ($5,000), to be paid to her within one year from the date of my decease. The remainder of my estate is to be divided equally between my betrothed, Miss Sarah C. Fairman, and my child, Mary Ely Whitney, at such time and in such manner as my executors may decide—the amount now invested as part of the capital of the firm of A. Whitney & Sons, to remain in their business, on interest, until such decision is made by my executor, said interest being subject to the order of the said Sarah C. Fairman for the support of herself and the said child, Mary Ely Whitney, and I hereby appoint my father, Asa Whitney, to be my executor.

This is my last will and testament made at Philadelphia, January 20, 1859.      GEO. WHITNEY. [SEAL.]

At the date of said will, Mr. Whitney was a widower and the father of one child, then living, Mary Ely Whitney ; and on January 25, 1859, he was married to Miss Fairman, the lady named in the will as his betrothed. Asa Whitney, the testator's father, named in the will as executor, died June 4, 1874. On April 6, 1880, the daughter, Mary Ely Whitney, was married to A. E. Outerbridge, Jr., and on May 12, 1881, their son, George Whitney Outerbridge, was born. Mrs. Outerbridge died on May 19, 1881, leaving her surviving her husband, A. E. Outerbridge, Jr., and her only son and child, George Whitney Outerbridge.

On March 6, 1885, George Whitney, the testator, died. His will was produced by his widow, Mrs. Sarah F. Whitney, in-

closed in a sealed envelope addressed in the testator's hand-writing—"Asa Whitney, Esq., Phila.　To be delivered to him at my death.　GEORGE WHITNEY."　The envelope with its inclosure had been handed to Mrs. Whitney at or about the time of their marriage and she had kept it thereafter.　This will was admitted to probate and on April 7, 1885, letters of administration c. t. a. were granted to his widow, Mrs. Whitney and his son-in-law, A. E. Outerbridge, Jr.　The Fidelity Insurance, Trust and Safe Deposit Company was duly appointed guardian of George Whitney Outerbridge.

There was no issue of the marriage of George Whitney and Mrs. Sarah F. Whitney, and the latter died on January 10, 1887, having devised and bequeathed by her will her residuary estate, real and personal, to her two sisters, Mrs. Margaret A. Lee and Mrs. Jane E. Brown, which will was also admitted to probate and letters granted to John H. Redfield, as executor thereof.

The question which arose was, whether by the marriage of George Whitney to Miss Sarah C. Fairman, after the execution of his will whereby he bequeathed to her the one half of his residuary estate, said will became inoperative as to her, so that upon his death she took under the intestate law, or whether she took under said will.

On March 24, 1887, the auditing judge, ASHMAN, J., commenting upon § 23, act of April 19, 1794, 3 Sm. L. 152; § 15, act of April 8, 1833, P. L. 249; Coates v. Hughes, 3 Binn. 511; Edwards' App., 47 Pa. 144; Walker v. Hall, 34 Pa. 483; Cavett's App., 8 W. & S. 25; ruled that the act of 1833, in its said section was an enabling act, "abrogating the common law rule which required marriage and the birth of issue to revoke an ante-nuptial testament, and under it, if a widow, who is not mentioned in her husband's will and whose marriage followed its execution, chooses to waive her share under the intestate law, the will will stand in its entirety;" that, in the interest of the widow, the section left to her the discretion whether the will should operate as to her or not, and that, in this instance, there was a will in which the husband had anticipated the legislature, and left to his proposed wife more than the intestate laws would give her, a case confessedly where the mischief which the act was intended to remedy did not exist; that the

statute should not be used to introduce a greater mischief, and deprive the wife of the larger estate bequeathed to her, because it had secured to her a smaller estate on the supposition that the will might leave her nothing; and adjudged that the estate of the deceased widow was entitled to receive, as legatee, the one half of the fund for distribution, and it was so awarded.

The Fidelity etc. Co., guardian of George Whitney Outerbridge, excepted to this adjudication:

1. [Disclosing a clerical error in the calculations.]

2. That the auditing judge erred in deciding that the estate of the deceased widow was entitled to receive as legatee one half of the fund for distribution.

The exceptions having been argued before the court in banc, on July 2, 1887, the following opinion and decree was filed; PENROSE, J.:

The doctrine of the civil law with regard to implied revocation of wills by subsequent marriage and birth of issue, was, as we learn from the authorities, reluctantly, and only by degrees, adopted by the common law; and it was not until the case of Christopher v. Christopher, 2 Burr. 2182, n., decided in 1771, and followed in 1773 by Sprague v. Stone, 2 Ambler 723, that the implication arising from such changed state of circumstances was admitted to extend to a will of lands; though as early as 1682, in Overbury v. Overbury, 2 Show. 242, it had been decided that it did extend to a will of personal property. The revocation so effected, which at a later date was held to be a rule of law independent of any question of intention, was a revocation in toto.

But while it was thus established that subsequent marriage and birth of issue, conjointly, would revoke, marriage alone or birth of issue alone would not; and hence, unless the testator owned lands in which the wife would have dower, a will in favor of strangers, executed before marriage, was, unless there should be issue, an absolute exclusion from any participation in her husband's estate. And this was the condition of the law in Pennsylvania (though there had been legislation on the subject, which had been repealed or in some way become inoperative, as early as 1683, and in 1697 and 1700: Duke of Yorke's Book of Laws, 231, 264; Miller's Chart. and Acts of

Ass., Appendix II., 2) when the act of February 4, 1748–9, 2 Miller Ch. and Acts, 32, was passed, providing that as to a subsequent wife or subsequently born children not named in the will the estate of a testator, both real and personal, should pass as if he had actually died without a will.

This act was followed by that of March 23, 1764, 3 Sm. L. 159, which applied to wives as well as husbands, making wills inoperative as against after-born children not provided for therein. Then came the act of April 19, 1794, 3 Sm. L. 152, declaring that as against children not provided for, or a widow, a testator whose will was made prior to marriage should be treated as if he had died without any will; and this, with slight verbal changes, was re-enacted by the act of April 8, 1833, the fifteenth section of which is as follows: " When any person shall make his last will and testament, and afterwards shall marry or have a child or children not provided for in such will, and die leaving a widow and child, or either a widow or child or children, although such child or children be born after the death of their father, every such person, so far as shall regard the widow or child or children after-born, shall be deemed and construed to die intestate, and such widow, child, or children shall be entitled to such purparts, shares, or dividends of the estate, real and personal, of the deceased, as if he had actually died without a will."

Three things are to be observed of this act: (1) the will is inoperative either as to the wife or as to the after-born children not provided for; (2) the intestacy thus caused is, in either case, partial—not total as under the doctrine adopted by the common law in case of marriage and birth of issue; and (3) it deals with the widow qua widow, and not in her individual capacity.

It cannot be doubted that the object of this legislation, so far as the wife of a testator is concerned, was solely to protect her from the injustice of being cut off from her husband's estate by a will made before marriage. Every man is permitted to make a will, and every individual to be a legatee or devisee; and statutes in derogation of these rights are to be construed strictly. A man's will executed before marriage is inoperative under the act of 1833 and the acts prior thereto, as against his widow to the extent of the interest which she takes, as widow,

under the intestate laws, and as against subsequently born children not provided for in it, to the extent of their interest under those laws. It is effective in either case as against children born before its execution, whether provided for or not. If having children he makes a will giving his entire estate to strangers, his subsequent marriage can confer no rights on such children; it is only as to after-born children and the wife herself, that the act provides for an intestacy, and that pro tanto only. If the widow avail herself of the act, she alone is benefited: "Such widow shall be entitled to such purpart, share, and dividend of the estate, real and personal, of the deceased, as if he had actually died without any will." If she do not avail herself of it, the result is the same; the will stands as to all the world except as against the widow or after-born children not provided for, and the intestate laws have no application. If this be so as to a will making no provision for children born before its execution, it must, a fortiori, be so as against those who are provided for. If, for example, the ante-nuptial will gives half of the estate to the children by a previous marriage and half to the parents of the testator, the subsequent marriage would reduce each class of legacies one third, and by no possibility could either be increased. If the wife, having means of her own, should decline to take the share given to her by the intestate laws, it would not go to the children and thus increase their shares at the expense of those of the grandparents. If, instead of one half being given to the parents of the testator, it is given, as in the case now before us, to the intended wife, by what principle or under what law can the subsequent marriage, in that case more than in the other, increase the shares of the children born of the prior marriage and taking under the will the other half? The act was not designed to penalize marriage.

Manifestly the husband was not the person intended to be benefited by the act, for he always has it in his own power to revoke the ante-nuptial will either in part or altogether: the children born before its execution, whether provided for or not, were not so intended, for the act makes no reference to them whatever; and after-born children not provided for are the subjects of special, independent provision, irrespective of what becomes of the share of the widow. No question of public policy

is involved, for the law encourages marriage and looks with especial favor upon the rights of widows. The conclusion, therefore, is irresistible that the only object was the protection of the widow herself, and it is contrary to all rules of interpretation to permit an act designed to confer a benefit to be so enforced as to cause an injury. Invito beneficium non datur. Quilibet potest renunciare juri pro se introducto. Why take from a widow the benefit of a gift contained in an ante-nuptial will, when the law, except in the case of after-born children not provided for, makes no disposition of it when so taken? The spirit and reason of a law are always to be considered, and a blind adherence to the letter will not at the present day be permitted to lead to an injustice or an absurdity, any more than it was when the sailor, of whom Blackstone on the authority of Cicero tells us, claimed the ship, which he was too sick to get away from, under the law which gave it in absolute terms to him who remained on board in a storm after all others had abandoned it: See Kinter's Appeal, 62 Pa. 318; Odiorne's Appeal, 54 Pa. 175; Graham v. Ingleby, 1 Exch. 61, 65; 1 Bl. Com. 87; Co. Litt. 45, a.

But if it should be conceded that a woman, marrying after the execution of her husband's will, must take as widow her share under the intestate laws, and that to this extent he is to be regarded as having left no will, what forbids her taking also, qua legatee, to the extent that the will is not thus made inoperative? As already observed, the act was not intended to inflict a penalty for marrying; and being, so far as it interferes with the right to freely dispose of, or freely receive property, in derogation of the common law, it is to be strictly construed. It deals with the woman in her capacity as widow, only, and as against her as such, and pro tanto merely, provides for an intestacy. As to anything given to her as legatee in excess of her share as widow, it is silent. Prior to the statute which put her to an election, a wife in the absence of a provision to the contrary in the will could take her dower and also what the will gave her, though her estate under the will exceeded her dower: Evans v. Webb, 1 Y. 425; and the 11th section of the act of 1833, which puts the widow to her election, did not apply to the case of an ante-nuptial will. Even since that act there are cases in which the wife may take under the will and also under the intestate laws: Grim's Appeal, 109 Pa. 391; Car-

man's Appeal, 2 Penny. 332. It would seem, therefore, that one reason for the passage of the act of April 11, 1848, § 11, P. L. 537, was that widows should be placed upon a footing of entire equality without reference to the fact whether the will was made before or after marriage. This appears from the act itself, which provides as follows: " The 11th section of the act of April 8, 1833 . . . . . shall not be construed to deprive the widow of the testator, in case she elects not to take under the last will and testament of her husband, of her share of the personal estate of her husband under the intestate laws of this commonwealth; but the said widow may take her choice, either of the bequest or devise made to her under any last will and testament, or of her share of the personal estate under the intestate laws aforesaid." If this had been intended only for the case of post-nuptial wills, instead of providing for an election between her rights under the intestate laws and the bequest or devise made to her by " any " last will and testament, the act would have said that she should elect between her rights under the intestate laws and the bequest or devise made to her by " *such* last will and testament "—that is, the last will and testament spoken of in the previous clause of the sentence referring to § 11, act of 1833; but instead of this, the broadest and most comprehensive language is used: " *any* " last will and testament. As was said in Turnpike Company v. McNamara, 72 Pa. 280, in construing an act of congress containing this word, " Language could not be broader, and no exception or qualification is to be found in the act, while the design . . . . . makes the meaning perfectly clear."

As to what was said by the judge delivering the opinion in Edwards' Appeal, 47 Pa. 144, to the effect that the subsequent marriage of a testator in itself operates as an absolute revocation of his will, irrespective of action or election on the part of the widow, it is sufficient to remark that it was unnecessary to the decision of the case and must be regarded as dictum only. The effect of the doctrine asserted would be to make marriage alone accomplish all that under the act results from marriage and birth of issue not provided for; and in such case, if an absolute intestacy as to all that may have been given to the wife beyond what she would take under the intestate laws is produced, the will becomes inoperative not only as against after-

born children not provided for—the only persons other than the widow referred to in the act—but also as to children born before the will although provided for. Of course even the dictum of a judge of the Supreme Court is to be treated with the most profound respect; but we cannot close our eyes to the fact that the learned judge who spoke in this way in Edwards' Appeal was rather inclined to make assertions which his brethren in subsequent cases where the point was directly involved have not hesitated to declare extra-judicial and unsound. There are many illustrations of this: See Patterson v. Swallow, 44 Pa. 490; Burk v. Gleason, 46 Pa. 297; Miller v. Franciscus, 40 Pa. 335; Kenyon v. Stewart, 44 Pa. 179; Fransen's Will, 26 Pa. 202; commented on, in the order stated, in Yard v. Murray, 86 Pa. 113, and Massey's Appeal, 88 Pa. 470; in Shumate v. McGarity, 83 Pa. 38, and Commonwealth v. Powell, 51 Pa. 438; in Warfield v. Fox, 53 Pa. 382, and in Clark v. Trindle, 52 Pa. 496; in Wilson v. Gaston, 92 Pa. 211, and Broe v. Boyle, 108 Pa. 82. See also Judge SHARSWOOD'S comment on Wallace v. Harmstad, 44 Pa. 492—a case in which homage is confounded with fealty—in Lecture on Feudal Law, 223, etc.

It certainly would be a remarkable result of a law intended for the protection of married women, that a will made in immediate contemplation of marriage and containing a provision for the future wife, as such, should, contrary to her wishes, be struck down by the act of marriage, and that too in favor of persons not mentioned by the statute, it might be, remote, collateral relatives of the husband. Such an effect was not permitted in the case of a woman's will, though the law ordinarily makes her marriage an absolute revocation: Lant's App., 95 Pa. 284; and this, not on the mere ground of fraud, but upon the broad principle declared in Bond v. Bunting, 78 Pa. 219, and numerous other cases, that wherever a party has power to do an act not forbidden by law, and means to do it, the instrument he employs shall be construed so as to give effect to that intention. It cannot be doubted that the testator in the present case intended by this will, which was not to take effect until his death, and, therefore, not until after the contemplated marriage, that the lady whom he had contracted to make his wife should receive a larger share of his estate than the law would give her without the will; and he might have accomplished this

Opinion of Court below.

by a marriage settlement with power of revocation. It cannot be supposed that the will was meant as a sham or a pretence. The name by which the instrument is designated is immaterial; and if, treating it as a will, it would be, contrary to the intention of the maker, nugatory, it will, under the principle of Lant's Appeal, be allowed to take effect as a settlement. A trust for separate use, which can only exist where the beneficiary is a married woman, will be sustained if the marriage, when the trust was created, was in immediate contemplation; the marriage being treated, for the purpose of preserving the trust, as if it had actually taken place. It would involve no great strain of the statute to apply this principle to a marriage made in pursuance of a previous contract and treat its completion by the performance of the marriage ceremony as relating back to the date of its inception; just as in case of a contract for the sale of lands, which, thereafter, as between heir and executor, are regarded as actually sold.

How far the preservation of the will for a period of more than twenty-five years would, under the authorities, especially in connection with the act of June 4, 1879, P. L. 88, operate as a republication after marriage, is a question which need not be considered. In Long v. Aldred, 3 Add. 48, Sir John Nichol was of opinion that it would so operate. It is true there is a dictum of Judge WOODWARD in Fransen's Will, 26 Pa. 202, that since the act of 1833 a will cannot be republished by parol. This might be where the effect was to revoke an intermediate will, without affecting the question presented in the present case. But the view expressed by Judge WOODWARD was not concurred in by Chief Justice LEWIS and Judge KNOX; and the remarks of Chief Justice MERCUR in Broe v. Boyle, 108 Pa. 82, show that the court as now constituted, notwithstanding what was said in Fransen's Will, look upon the question as still an open one.

Upon the whole we are convinced that the views of the auditing judge as to the rights of the parties to this controversy were entirely correct; and the adjudication, modified in accordance with the first exception as to the amount distributed, is therefore confirmed.

A final decree having been entered, the exceptant took his appeal, specifying as error the order confirming the adjudication of the auditing judge.

*Mr. Albert A. Outerbridge* and *Mr. Furman Sheppard*, for the appellant:

1. The legislation in Pennsylvania on the general subject is, first, the law of 1693: Duke of Yorke's Laws, 231; the next, the law of 1697, found in the appendix to the second volume of Peter Miller's Charters and Acts of Assembly, p. 10; also in D. of Y.'s Laws, 264; then the act of 1700, in the appendix referred to, pp. 11, 12; then the act of 1705, vol. I., Peter Miller's Charters, etc., pp. 25–27; next, the act of 1748–9, vol. II., Idem, p. 22; next, the act of March 23, 1764, 1 Dall. L., App., 47; and 3 Sm. L. 159; then the act of April 19, 1794, 3 Sm. L. 152. The present legislation on the subject is in §§ 15 and 16, act of April 8, 1833, P. L. 251.

2. The act of 1833, like that of 1794, and that of 1764, does not regard the circumstance of a provision for the widow in the ante-nuptial will of the husband, but does regard the fact of a provision for a child in such will, although it disregards the quantum of such provision, if any there be. There is a difference in the effect produced by marriage upon the will of the wife, and the effect produced by it upon the will of the husband, although the difference is in extent, rather than in kind. The wife's will is revoked by the subsequent marriage, so as to become completely inefficacious for all purposes; the husband's will becomes inefficacious as regards the widow, or as regards the child or children unprovided for, though as to them it is as completely inefficacious " as if he had actually died without any will." The one will is inoperative pro toto, the other is inoperative pro tanto, and as far as each is inoperative, it is as if it never had any existence.

3. In England, the doctrine, the history and development of which is found in Johnston v. Johnston, 1 Phil. Ecc. J. 447; 1 Williams on Execrs. 166; Marston v. Roe, 8 Ad. & E. 14 (35 E. C. L. R. 457); 1 Jarman on Wills, 122, has passed through various stages of growth in successive periods of time, with much debate and difference of opinion, and was not placed upon its present foundation and defined with its present limitations until in 1838 in the case of Marston v. Roe, supra. With us the doctrine took legislative form and shape by a plain and simple enactment as early as 1748, since which time its legislative form and shape have not been substantially changed. In Eng-

land, the whole subject was one of judicial legislation. With us, the whole subject is purely statutory; the law as it now is did not grow out of anything contained in the common law, and the functions of the courts are simply interpretative.

4. The effect of the statute on the wife's ante-nuptial will being shown in the case of Fransen's Will, 26 Pa. 202, the like effect of the statute upon the husband's ante-nuptial will, as respects the wife, is shown in Edwards' App., 47 Pa. 144, which is submitted as precisely in point and a direct authority. "The revocation as to her did not depend on the provisions made for her; it resulted absolutely as a legal consequence of the marriage:" per WOODWARD, C. J. Reference is also made to Walker v. Hall, 34 Pa. 483, wherein it was stated: "If a man makes his will and marries and dies, leaving a widow, so far as regards the widow he dies intestate; that is, his will is revoked pro tanto," etc. "It is clear therefore that all our rules in such cases are statutory rules, established by the legislature, by which the common law has been either repealed or altered, or enforced by positive legislative sanction, and therefore not open to the doctrine of implied presumption." Walker v. Hall and Edwards' Appeal are cited with approval in Willard's App., 68 Pa. 330. "It seems at first rather startling to say that a will like the present, executed in contemplation of marriage and providing for the wife and children of the marriage, should be revoked by such marriage and the birth of a child; on the cases cited, however, there is no doubt that the law so stands, and I must reject the motion for probate:" Sir C. Cresswell in Goods of Cadywold, 1 Swab. & Tr. 34. The same principle was expressed and acted upon in Otway v. Sadleir, 4 Irish Jurist, N. S., 97.

5. Section 11, act of 1833, relates to "a devise or bequest by a husband to his wife," and § 11, act of 1848, declares that that section shall not be construed to deprive her of her share of the personalty, in case she elects not to take "under the last will and testament of her husband." The alternative words "any last will" must be taken to refer to such a will as is before mentioned in the enacting part of the section, and must, therefore, mean any last will of the husband, that is to say, a post-nuptial will. The provision in § 15, act of 1833, by which a subsequent marriage annuls, as to the widow, a prior will, is not affected by § 11 of the married women's act, and is left standing in full force and effect.

Arguments.

*Mr. John G. Johnson* and *Mr. Geo. W. Biddle* (with them *Mr. A. Sidney Biddle*), for the appellees:

The use of the word "revoked" in § 16 of the act of April 8, 1833, P. L. 251, to wit: "That a will executed by a single woman shall be deemed revoked by her subsequent marriage and shall not be revived by the death of her husband," and the absence of that word in § 15 of the same act is clearly intentional; hence all of the English authorities cited in the exceptant's brief, depending upon the statute 1 Vict. c. 26, which provides that "Every will made by a man or woman shall be revoked by his or her marriage . . . . ." are inapplicable.

1. The argument of the exceptant referring to the interpretation of statutes omits the familiar rule of 1 Bl. Com. 87, that there are three points to be considered, the old law, the mischief, and remedy. An excellent example of the manner in which a remedial statute should be construed is found in Kinter's App., 62 Pa. 322. The statute under consideration is certainly remedial, and is therefore to be construed for the benefit of the person on whose behalf it was enacted. The old law and the mischief was the danger of a will being permitted to override the intention of a testator by operating in a state of circumstances unforeseen, and for which he either neglected or was unable to provide: Argument of Ingersoll and Tilghman, Coates v. Hughes, 3 Binn. 500.

2. The common law following the civil law which provided that subsequent marriage and birth of issue, or the birth of a child, though posthumous, after the execution of the will, and although there were previous children, revoked the will, decided that the marriage of a woman revoked her will made previously: Forse v. Hembling, 4 Co. R. 60; that the birth of a child revoked a will: Overberry v. Overberry, 2 Show. 242. So, in 1792, it was decided, in a case like the present, that marriage was not a revocation of a will devising real estate to the intended wife: Brown v. Thompson, 1 Eq. Cas. Ab. 413. In Sprague v. Stone, 2 Amb. 721 (1773), it was held that marriage and the birth of a child was a revocation of a will of land. "As to an implied revocation from alteration of circumstances, it is now settled that as to personal estates marriage and having a child is a revocation; but no case has yet holden marriage alone to be a revocation:" Wellington v.

Wellington, 4 Burr. 2171. The above were the principal cases at common law in England prior to the Revolution.

3. Such was the condition of the law when the act of April 19, 1794, 3 Sm. L. 532, which is precisely the same as § 15, act of April 8, 1833, P. L. 249, was passed. The act of 1833 provided also in its § 11, that a devise to a wife was to be in lieu of dower, and "that nothing herein contained can deprive the widow of her choice, either of dower or of the estate so devised or bequeathed:" See Parke & J. Dig. 875. By § 11, act of April 11, 1848, P. L. 537, it was provided that § 11, of the act of 1833, should not be so construed to deprive the widow of the testator, in case she elect not to take under the will of her husband, of her share of the personal estate under the intestate laws, but that the widow might take her choice, etc. Obviously the construction of the last mentioned statute did away with the efficacy of § 15, act of 1833, so far as the widow is concerned. It is plain that the construction asked for by the exceptant is in the very teeth of § 11, act of 1848. Edwards' App., 47 Pa. 144, is correctly decided, but the dicta therein are not of binding authority.

4. The will of Mr. Whitney may be treated either (a) as the equivalent of an ante-nuptial settlement, and under the doctrine of Lant's App., 95 Pa. 279, so enforceable; or, (b) as a will speaking from the date of the death of the testator, under the terms of the act of June 4, 1879, P. L. 88. Either way the rights of the estate of the appellees are preserved.

OPINION, MR. JUSTICE PAXSON:

We see no difficulty in this case. We regard the question involved as a very simple one, notwithstanding the amount of learning expended upon it. The facts are substantially as follows: On January 20, 1859, George Whitney, a widower with one child, made his will in anticipation of marriage, by which he gave the one half of his estate (after deducting a legacy of $5,000 to his sister-in-law) to his child, and the other half thereof to his betrothed. He was married to the latter five days thereafter. His will was placed in a sealed envelope directed to his executor, and handed to his wife, who kept it in her possession until his death, many years afterwards, when she produced it. There were no children of this marriage, so that

when George Whitney died, he left surviving him the one child by his former marriage, and his widow, Mrs. Sarah F. Whitney. The precise question is whether the widow takes under the will or the intestate laws, it being alleged by the representatives of the child that under the act of assembly the marriage of the testator after the making of his will, was a revocation thereof.

The 15th section of the act of 1833, P. L. 250, provides as follows : " When any person shall make his last will and testament, and afterwards shall marry or have a child or children not provided for in such will, and die leaving a widow and child, or either a widow or child or children, although such child or children be born after the death of their father, every such person, so far as shall regard the widow, or child or children after-born, shall be deemed and construed to die intestate ; and such widow, child or children, shall be entitled to such purparts, shares and dividends of the estate, real and personal, of the deceased, as if he had actually died without any will."

The testator, as before stated, left no after-born children. We shall consider the act, therefore, only as it affects the widow. Its effect, in case of after-born children, will only be referred to incidentally. It may be observed just here that, by the terms of the act, the birth of a child after the making of a will has no effect upon such will, unless such child is unprovided for therein, and the amount of such provision is not important. In the case of an ante-nuptial will the question of a provision for the wife or widow does not arise. The act does not say in such instances, as it does in the event of after-born children, that the will shall be inoperative as to her, unless provision has been made for her in the will.

It would require much time and occupy an unnecessary amount of space, to review at length the legislation and judicial decisions in England and this country upon this interesting subject. This has been done elaborately and ably by the learned counsel on either side. They have given us all the learning bearing upon the case that is valuable. I shall confine myself to indicating the conclusions to which we have arrived without extended discussion.

We have no case in Pennsylvania which rules this. Edwards' App., 47 Pa. 144, was much relied upon by the appel-

lants, but a careful examination of it shows that it does not cover the case in hand. The decision there was, as nearly as I can gather it from the report: 1st. That the estate devised to Sarah Devitt was a fee simple; and 2d. that the provision in the will for the issue of Sarah Devitt was not a provision for the testator's child, as there was no evidence that the testator contemplated marriage when the will was made, and the provision itself was broad enough to embrace the issue of Sarah Devitt by another husband. The language of the opinion of Chief Justice WOODWARD was perhaps broader than the point decided, when he said: "The revocation as to the widow, I repeat, was absolute the instant of the marriage. It did not wait for her election, any more than it depended upon the provision made for her. And a will revoked is as if it had never been made." A similar view is indicated in Walker v. Hall, 34 Pa. 483; but in that case the will was not made before the marriage. No fault is found with the decision of either of those cases, neither of which, however, rules the present one.

The section of the act of 1833 above referred to does not use the word "revoked," in which it differs from the 16th section of said act, which declares: "That a will executed by a single woman shall be deemed revoked by her subsequent marriage, and shall not be revived by the death of her husband." The use of the word "revoked" in this section, and its absence in the preceding one, is clearly intentional. The will of a single woman is no doubt absolutely revoked by her subsequent marriage, and it is no longer a will for any purpose. But I am inclined to think that the word "revoked" has sometimes been applied inadvertently to the 15th section of the act of 1833. The English cases under the statute 1 Vict. c. 26, are not applicable, for the reason that said statute declares in terms that "Every will made by a man or woman shall be revoked by his or her marriage." It is very clear, however, that under our act of 1833 an ante-nuptial will can be avoided by the widow, so far as her rights are concerned; that is to say, she can elect to come in and claim her share of her husband's estate under the intestate laws. In all other respects the will stands. And if she does not elect to make such claim, the will is not affected in any respect.

This testator made a valid will. There can be no doubt that

he intended to give his betrothed the one half of the residue of his estate. He not only intended it, but he acted upon his intention, as his will shows. And if the fact be, as is fairly to be presumed, that he not only gave the will to his betrothed to keep, but also communicated the contents of it to her, it is a serious question under some of our cases whether it was not something more than a will, and in reality a settlement of so much of his estate upon his future wife in consideration of marriage. Equity, which disregards the form and grasps the substance, would have no difficulty in reforming a testamentary paper, and declaring it a marriage settlement, where the consideration and circumstances justify it. This was done in Lant's Appeal, 95 Pa. 279. But we are not required to decide such a point in this case. It rests upon other grounds.

We regard the 15th section of the act of 1833, which is a re-enactment of the act of 1794, as an enabling act. It was intended for the benefit of the widow or child, and to provide against the improvidence of husbands who should neglect to alter their wills in accordance with the changed circumstances caused by subsequent marriage or birth of issue. In no sense was it intended to benefit the husband or father. Being an enabling statute it is to be construed liberally, or as Blackstone says: "And it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy:" 1 Bl. Com. 87. The mischief was that many improvident husbands left no provision for their wives. The act declares for remedy that the widow, whether provided for or not, should have her share of the estate under the intestate laws. But the act does not force it upon her. It is hers if she elect to take it, not otherwise. Being for her benefit it is for her to elect to accept its benefits, and if the benefits under the will are greater than under the intestate laws, the statute ought not to be enforced against her option. If we were in doubt as to this, a ready solution is found in the eleventh section of the act of 1848, which provides that the widow may take her choice of the bequest or devise made to her under any last will and testament, or of her share under the intestate laws. It will not do to say that this is not a will, that it was revoked by the marriage of Mr. Whitney, and that the statute of 1848 does not apply. It was a will, valid as to all the world except the widow, and valid as to her until she

elected to claim her share under the intestate laws. She elects
to take the benefits under her husband's will and I know of no
law or reason to prevent her.

The decree is affirmed, and the appeal dismissed
at the costs of appellants.