**[J-48-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| IN RE: TRUST UNDER DEED OF DAVID P. KULIG DATED JANUARY 12, 2001 | : No. 97 MAP 2016<br>:<br>: Appeal from the Order of the Superior<br>: Court at No. 2891 EDA 2014, dated<br>: December 24, 2015, Reconsideration<br>: Denied February 23, 2016, Affirming the<br>: Decree of the Court of Common Pleas<br>: of Bucks County, Orphans' Court<br>: Division, at No. 2013-0170 dated<br>: September 12, 2014.<br>:<br>: ARGUED: May 10, 2017 |
| APPEAL OF: CARRIE C. BUDKE AND JAMES H. KULIG | |


**OPINION**


JUSTICE WECHT                                             DECIDED: December 19, 2017

This Commonwealth has a "long existing public policy . . . to protect the rights of [a surviving spouse]" against total disinheritance by his or her deceased spouse. *In re Pengelly's Estate*, 97 A.2d 844, 849 (Pa. 1953).[1] For centuries, the common law

---

[1] *See, e.g., In re Schwartz' Estate*, 295 A.2d 600, 602 (Pa. 1972) (observing that Pennsylvania common law and statutory law have sought "to prevent a husband from indirectly disinheriting his wife through an *inter vivos* transfer while retaining control over the use and enjoyment of the property during his lifetime"); *see also* Alan Newman, *Incorporating the Partnership Theory of Marriage into Elective Share Law: The Approximation System of the Uniform Probate Code and the Deferred-Community-Property Alternative*, 49 EMORY L.J. 487, 493 n.29 (2000) (noting that, "[t]raditionally, the policies underlying the prohibition of one spouse's disinheriting the other were to ensure a means of support for a surviving spouse who might otherwise become a ward of the state," but opining that the modern Uniform Probate Code has adopted a model aimed more at ensuring that a spouse, as marital partner, obtains "a fair share of property they helped to accumulate during the marriage").

prevented such disinheritances under the doctrine of dower and curtesy, which established for surviving spouses threshold entitlements to their deceased spouse's property.[2] Pennsylvania's Probate, Estates and Fiduciaries Code ("PEF Code" or "the Code")[3] includes two provisions designed to protect against negligent omission of a spouse from a will or disinheritance by other means. First, if the parties marry after the operative will has been executed, Subsection 2507(3) of the Code entitles the excluded spouse (referred to as a "pretermitted spouse"[4]) to take the share of the estate to which she[5] would have been entitled had the decedent died intestate, *i.e.*, without a will. *See* 20 Pa.C.S. § 2507(3). Second, Section 2203 confers upon any surviving spouse,

---

[2] An in-depth review of this history would exceed the scope of this Opinion. However, there is an extensive body of literature on that history. *See, e.g.*, Terry L. Turnipseed, *Community Property v. The Elective Share*, 72 La. L. Rev. 161, 163-69 (2011). Professor Turnipseed suggests that principles resembling dower and curtesy can be traced back over 4,000 years to the Code of Hammurabi. *See* Terry L. Turnipseed, *Why Shouldn't I Be Allowed to Leave My Property to Whomever I Choose at my Death* (*or How I Learned to Stop Worrying and Start Loving the French*), 44 Brandeis L.J. 737, 742 n.33 (2006) (discussing provisions pertaining to the inheritance of land as between son and wife based upon the ability to maintain it in service of feudal obligations while the husband is away serving the King in war); *cf.* Janet Loengard, *Interpretation and Re-interpretation of a Clause: Magna Carta and the Widow's Quarantine*, 25 Wm. & Mary Bill of Rts. J. 403 (2016) (examining the relationship between the common-law doctrine of quarantine, which protected a widow's right to remain in the marital residence for a period of time pending assignment of her dower).

[3] Act of June 30, 1972, P.L. 508, No. 164 (codified as amended 20 Pa.C.S. §§ 101, *et seq.*).

[4] "A child or spouse who has been omitted from a will, as when a testator makes a will naming his or her two children and then, sometime later, has two more children who are not mentioned in the will." *Heir, pretermitted heir*, Black's Law Dictionary 841 (10th ed. 2014).

[5] Code provisions, of course, apply equally without regard to sex or gender of any spouse whom they affect. Throughout this Opinion, we use the female pronoun as a convenience, reflecting the sex of the surviving spouse in this case.

including but not limited to a pretermitted spouse, a "right of election," which entitles her to take a one-third share of specified categories of property, including the probate estate as well as assets nominally transferred during the decedent's lifetime (*inter vivos*) as to which he retained control to dispose of as he pleased at the time of his death. *See* 20 Pa.C.S. § 2203. The total amount of the elective share is reduced by other property and assets she obtained from the decedent by other means. *See* 20 Pa.C.S. § 2204.

In today's case, we consider for the first time the effect of 20 Pa.C.S. § 7710.2, enacted in 2006, upon the scope of the assets used to calculate the pretermitted spousal share. Section 7710.2 provides that the rules of construction that apply to the provisions of testamentary trusts also apply to the provisions of *inter vivos* trusts.[6] For the reasons that follow, we reverse the Superior Court's determination that the revocable *inter vivos* trust at issue should have been included in David Kulig's estate for purposes of discerning the pretermitted spouse's statutory entitlement under Section 2507.

On January 12, 2001, while married to Joanne Kulig ("Joanne"), David Kulig ("Decedent") executed a revocable trust (the "Trust") naming himself as trustee. The named beneficiaries of the Trust upon Decedent's death were his then-wife Joanne, and the children born to Decedent and Joanne. Pursuant to the terms of the Trust, Decedent had the prerogative to receive any portion of the trust income during his

---

[6] *See* 20 Pa.C.S. § 7710.2 ("The rules of construction that apply in this Commonwealth to the provisions of testamentary trusts also apply as appropriate to the provisions of inter vivos trusts.").

lifetime, to draw any amount of the trust principal for his own welfare, comfort, and support, and to terminate the Trust.

Joanne died on August 15, 2010. On December 13, 2010, Decedent prepared a Last Will and Testament. Approximately one year later, on December 30, 2011, Decedent married Mary Jo Kulig ("Wife"), Appellee herein. Since the will had been executed before his second marriage, it made no provision for Wife. Nor did the will include any indication that Decedent had contemplated remarriage when he executed it.

On February 3, 2012, barely one month after marrying Wife, Decedent died, survived by Wife and by his children, Carrie C. Budke and James H. Kulig (collectively "Children"), Appellants herein. By the terms of the Trust, if Joanne predeceased Decedent, the balance of the Trust corpus was to be divided and distributed to Children according to the Trust's terms. Upon Decedent's death, the Trust had a value of $3,257,184.74. As of June 14, 2012, Decedent's probate estate (excluding the Trust) was valued at $2,106,417.26. As well, Wife undisputedly was entitled upon Decedent's death to an ERISA benefit plan worth at least $1,500,000.

The parties stipulated that Wife, a pretermitted spouse under Pennsylvania law, is entitled to receive the same share of Decedent's estate to which she would have been entitled had he died intestate, *see* 20 Pa.C.S. § 2507(3),[7] *i.e.*, one half of the

---

[7]    "If the testator marries after making a will, the surviving spouse shall receive the share of the estate to which [s]he would have been entitled had the testator died intestate, unless the will shall give [her] a greater share or unless it appears from the will that the will was made in contemplation of marriage to the surviving spouse." 20 Pa.C.S. § 2507(3).

intestate estate,[8] as defined by Chapter 21 of the PEF Code. In providing that "the surviving spouse shall receive the share of the estate to which [s]he would have been entitled had the testator died intestate," Subsection 2507(3) incorporates by reference Subsection 2101(a). Subsection 2101(a) defines the intestate estate as "[a]ll or any part of the estate of a decedent *not effectively disposed of by will or otherwise.*" 20 Pa.C.S. § 2101(a) (emphasis added).

The parties disputed whether the Trust may be considered part of the intestate estate for purposes of calculating the pretermitted spousal share or is instead available to Wife only in the event that she chooses to claim her elective share pursuant to Section 2203 of the Code, which expressly includes in the elective share "[p]roperty conveyed by the decedent during his lifetime to the extent that the decedent at the time of his death had a power to revoke the conveyance or to consume, invade or dispose of the principal for his own benefit." 20 Pa.C.S. § 2203(a)(3). In the former case, Wife would receive one half of the intestate estate and one half of the Trust corpus, with no deductions. In the latter case, Wife would have access to the Trust only by spousal election, pursuant to which she would receive one third of the probate estate and one third of the Trust corpus, subject to certain charges against the gross elective share. *See* 20 Pa.C.S. § 2204(c). According to the parties, if Wife prevails, she would take approximately $1.5 million more than she would if Children's view is correct.[9]

---

[8] In relevant part, Subsection 2102(4) defines the intestate share for purposes of Subsection 2507(3) as follows: "If there are surviving issue of the decedent one or more of whom are not the issue of the surviving spouse, one-half of the intestate estate." 20 Pa.C.S. § 2102(4).

[9] Children note that, if their view prevails, which undisputedly is consistent with the law at least until 2006, Wife may opt to take $2,287,867.33 (the elective share, offset by (continued…)

Children filed a petition for declaratory judgment[10] before the Orphans' Division of the Bucks County Court of Common Pleas (hereinafter the "Orphans' Court"), seeking a declaration that the Trust was excluded from Wife's pretermitted spousal share. It is the "effectively disposed of . . . otherwise" in Subsection 2101(a)'s definition of the intestate estate that Children argue excludes revocable trusts from the intestate estate:

> Assets that pass outside a decedent's probate estate, such as by the terms of a funded *inter vivos* trust (whether revocable or irrevocable), by operation of law (*e.g.*, jointly owned assets, "payable on death" accounts, "in trust for" accounts) or by beneficiary designation (*e.g.*, life insurance, IRAs), are <u>not</u> subject to the intestacy statutes because such assets are "effectively disposed of . . . otherwise."

Brief for Children at 16-17 (emphasis in original) (citing *Estate of Sauers*, 32 A.3d 1241, 1249 (Pa. 2011) (excluding life insurance benefits as estate assets); *Estate of Rood*, 121 A.3d 1104, 1115 (Pa. Super. 2015) (excluding "payable on death" accounts as probate assets)).[11] Because revocable trusts typically, as in this case, provide for the

_____

(…continued)
the $1.5 million ERISA plan to which she is entitled in any scenario) or $2,553,208.63 (the pretermitted spouse share). Under Wife's view, which was adopted by the lower courts, the elective share would remain the same, but the pretermitted share would increase to $4,181,801.00, reflecting the addition of a one-half share of the revocable *inter vivos* trust at issue to the estate used to calculate the pretermitted share, which by virtue of being included in the pretermitted spousal share would not be subject to the offset for the ERISA plan that applies in the context of a spousal election. *See* Brief for Children at 49.

[10] *See* the Declaratory Judgments Act, Act of July 9, 1976, P.L. 586, No. 142, § 2 (codified as amended, 42 Pa.C.S. §§ 7531, *et seq.*).

[11] *See generally* Nathaniel W. Schwickerath, *Note, Public Policy & the Probate Pariah: Confusion in the Law of Will Substitutes*, 48 DRAKE L. REV. 769, at 785-96 & n.104 (2000) (discussing payable-on-death accounts, transfer-on-death registries for stocks and bonds, and life insurance, *inter alia*, as will substitutes, and citing *In re Estate of Stevenson*, 648 A.2d 559, 562 (Pa. Super. 1994)); *see also* Kara Peischl Marcus, *Comment, Totten Trusts: Pragmatic Pre-Death Planning or Post-Mortem Plunder?*, 69 TEMP. L. REV. 861 (1996) (identifying four main types of "will substitutes": life
(continued…)

disposition of the trust upon death of the settlor, they are by their nature materially the same as a joint bank account that passes by operation of law to the surviving holder or an account in the decedent's name with a payable-on-death designation. Children contend that no Pennsylvania case law has treated any such account, or a revocable trust, as part of the intestate estate for purposes of intestacy or pretermission. This, they contend, is the essence of assets "disposed of . . . otherwise" as intended by Subsection 2101(a). Wife opposed the petition, arguing primarily that, in calling for the application of the same interpretive principles to trusts that apply to wills, Section 7710.2 of the Code established that *inter vivos* trusts, like other assets, must be considered part of the intestate estate for purposes of calculating the pretermitted share.

On September 12, 2014, the Orphans' Court issued a Decree entering judgment in Wife's favor and a Memorandum Opinion in support thereof. The court began by asserting that Subsection 2507(3) effectively provides for a "modification" of a will that excludes a spouse who marries a decedent after execution of the will when the will contains no indication that it was prepared in anticipation of the marriage. Orphans' Court Opinion ("O.C.O.") at 7. Pursuant to Subsection 2507(3), the court found, Wife was entitled to the share of the probate estate that would have passed through intestacy in the absence of a will.

The Orphans' Court then turned to Section 7710.2, which provides that "[t]he rules of construction that apply in this Commonwealth to the provisions of testamentary trusts also apply as appropriate to the provisions of *inter vivos* trusts." 20 Pa.C.S.

(…continued)
insurance policies, pensions, revocable living trusts, and multiple-party or joint accounts).

§ 7710.2. The court observed that the 2005 Joint State Government Committee Comment to Section 7710.2 asserts that it "imports 20 Pa.C.S. §§ 2507, 2514, and 2517 and other statutory and judicial rules of interpretation that apply to trusts under wills," *i.e.*, testamentary trusts. Therefore, Section 7710.2 mandated application to the Trust of the same presumption applicable to the will under Subsection 2507(3). Accordingly, the estate comprising the pretermitted spousal share necessarily included the Trust corpus.

In so ruling, the Orphans' Court relied upon various aspects of the commentary appended to Section 7710.2. For example, the commentary to Section 7710.2 notes the "functional equivalence between the revocable trust and a will," such that "the rules for interpreting the disposition of property at death should be the same whether the individual has chosen a will or revocable trust." 20 Pa.C.S. § 7710.2, Uniform Law Cmt. ("ULC"). The comment continues: "Few legislatures have yet to extend these rules of construction to revocable trusts. . . ." *Id.* Thus, rather than "attempt[ing] to prescribe the exact rules to be applied to trusts," the Code "adopts the philosophy of the [Restatement (Third) of Trusts Section 25] that the rules applicable to trusts ought to be the same [as those applied to wills], whatever those rules might be." *Id.* The Orphans' Court inferred "that our General Assembly intended to place revocable *inter vivos* trusts on an equal footing with testamentary instruments and afford pretermitted spouses with an opportunity to claim an intestate share of said trusts." O.C.O. at 10. The court concluded that, by enacting Section 7710.2 with the ULC, the General Assembly, "became one of the 'few legislatures' to extend the rules of construction to revocable

*inter vivos* trusts, by importing [Subs]ection 2507(3)'s spousal protections for pretermitted spouses." *Id.* at 11.

The Orphans' Court further found that the General Assembly "implicit[ly] accept[ed] . . . the concept that statutory policy as to pretermitted heirs[12] . . . should be 'applied by analogy to the omitted [spouse] in the substitute for a will, or in the transfer revocable by the donor at the time of the donor's death.'" *Id.* at 12 (quoting RESTATEMENT (THIRD) OF TRUSTS § 25, Reporters Notes to cmt. d and e (Tentative Draft No. 1, approved 1996)). The Orphans' Court evidently inferred the legislature's adoption of Section 25 of the Restatement from the ULC's several references to it, which included the observation that Section 7710.2 "is patterned after" Section 25(2) of the Restatement.[13] 20 Pa.C.S. § 7710.2, ULC. Notably, the Orphans' Court cited no support for an explicit adoption of these or any other provisions of the Third Restatement in any other source of Pennsylvania law, or in the operative statutory text of any provision in the PEF Code.

Notwithstanding the superficial technicality of this analysis, the thrust of it is straightforward. Subsection 2507(3) reflects a legislative presumption as to the intent of

---

[12] Section 2507 also includes provisions governing other post-execution events warranting presumptions of subsequent intent, including the treatment of spouses named in a will who were divorced from decedents before death, provision for children by birth or adoption, and excluding a slaying spouse from taking under a spousal victim's will. *See* 20 Pa.C.S. § 2507.

[13] "A trust that is not testamentary is not subject to the formal requirements of § 17 ['Creation of Testamentary Trusts'] or to procedures for the administration of a decedent's estate; nevertheless, a trust is ordinarily subject to substantive restrictions on testation and to rules of construction and other rules applicable to testamentary dispositions, and in other respects the property of such a trust is ordinarily treated as though it were owned by the settlor." RESTATEMENT (THIRD) OF TRUSTS § 25(2).

a testator who failed to account for certain events that post-dated execution of his will—in this case, a post-execution marriage. The Orphans' Court interpreted Section 7710.2 as directing courts to assume the same intent not only with regard to the intestate estate incorporated by reference in Subsection 2507(3), but also as to revocable *inter vivos* trusts. Thus, to the extent that Subsection 2507(3) requires the implicit modification of a testamentary instrument in favor of, *e.g.*, a spouse married by the testator after executing the will, one also must infer such an intent with regard to the substance of a revocable trust executed before the marriage, and modify the instrument accordingly.

Upon review, the Superior Court largely adopted the Orphans' Court's reasoning. It, too, recognized Subsection 2507(3) as a "rule of construction" subject to Section 7710.2's direction that "the rules of construction that apply . . . to the provisions of testamentary trusts also apply as appropriate to the provisions of *inter vivos* trusts." *See In re Trust Under Deed of Kulig*, 131 A.3d 494 (Pa. Super. 2015) (hereinafter "*Kulig Trust*"). Although the Superior Court at least suggested that its ruling was compelled by the plain language of Sections 2507 and 7710.2, the court also explicitly relied upon the 2005 Joint State Government Commission Comment to Section 7710.2. Indeed, in addition to basing its conclusion "on [the ULC] and the plain unambiguous text of Section 7710.2," *Kulig Trust*, 131 A.3d at 499, the court also stated unequivocally that "the orphans' court was correct to refer to the comments to Section 7710.2 to discern our Legislature's intent." *Id.*; *see* 1 Pa.C.S. § 1939.

The court found the following Section 7710.2 commentary particularly convincing:

The revocable trust is used primarily as a will substitute, with its key provision being the determination of the persons to receive the trust property upon the settlor's death. *Given this functional equivalence between the revocable trust and a will, the rules for interpreting the*

*disposition of property at death should be the same whether the individual has chosen a will or revocable trust as the individual's primary estate planning instrument.* Over the years, the legislatures of the States and the courts have developed a series of rules of construction reflecting the legislative or judicial understanding of how the average testator would wish to dispose of property in cases where the will is silent or insufficiently clear. . . .

* * * *

Rules of construction attribute intention to individual donors based on assumptions of common intention. . . . *Rules of construction can also concern assumptions as to how a donor would have revised donative documents in light of certain events occurring after execution.*

20 Pa.C.S. § 7710.2, ULC (emphasis added).

The court concluded that, in enacting Section 7710.2, the General Assembly "intended the rule of construction employed to ascertain a decedent's intent in connection to a pretermitted spouse be applied to *inter vivos* trusts." *Kulig Trust*, 131 A.3d at 499. The court rejected Children's argument that 20 Pa.C.S. § 2203, which allows for a spousal election that includes a one-third share of "[p]roperty conveyed by the decedent during his lifetime to the extent that the decedent at the time of his death had a power to revoke the conveyance or to consume, invade or dispose of the principal for his own benefit," 20 Pa.C.S. § 2203(a)(3), provides the only means by which a pretermitted spouse may take against a revocable trust. The court reasoned that Section 2203 is not a rule of construction, but rather an independently prescribed spousal right that exists regardless of the decedent's presumed intention, and is available to any surviving spouse, not just a pretermitted spouse. That is to say, even a spouse named in the will might choose an elective share if it is of greater value than the decedent's specific bequest, whereas no spouse contemplated or provided for by a will, no matter how meagerly, may recover under Section 2507, which applies only when

there is no sign that the Decedent considered the surviving spouse. *See* 20 Pa.C.S. § 2507(3) (precluding application of that subsection if "it appears from the will that the will was made in contemplation of marriage to the surviving spouse"). Thus, the Superior Court affirmed the Orphans' Court's determination that the Trust should be incorporated into the estate for purposes of Wife's share as a pretermitted spouse.

Children filed a Petition for Allowance of Appeal. We granted review in order to consider whether the Superior Court erred in construing Section 7710.2 by reference to the commentary while deeming that provision unambiguous—and by extension whether the Superior Court erred in ruling that Section 7710.2 compelled inclusion of the Trust in the Estate subject to the pretermitted spousal share. *In re: Trust Under Deed of Kulig*, 158 A.3d 1234 (Pa. 2016) (*per curiam*). Children assert that the Superior Court's interpretation contradicts prior precedent concerning reliance upon statutory commentary and leads to absurd results.

We review this question of statutory interpretation *de novo,* and the scope of our review is plenary. *Trust Under Agreement of Taylor*, 164 A.3d 1147, 1153 (Pa. 2017) (hereinafter "*Taylor Trust*").

> The purpose of statutory interpretation is to ascertain the General Assembly's intent and to give it effect. 1 Pa.C.S. § 1921(a). In discerning that intent, courts first look to the language of the statute itself. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent and not look beyond the statutory language to ascertain its meaning. *See* 1 Pa.C.S. § 1921(b) . . . . Courts may apply the rules of statutory construction only when the statutory language is not explicit or is ambiguous. 1 Pa.C.S. § 1921(c).

* * * *

> We must read all sections of a statute "together and in conjunction with each other," construing them "with reference to the entire statute." 1 Pa.C.S. § 1922(2). When construing one section of a statute, courts

must read that section not by itself, but with reference to, and in light of, the other sections.

* * * *

Parts of a statute that are *in pari materia*, *i.e.*, statutory sections that relate to the same persons or things or the same class of persons and things, are to be construed together, if possible, as one statute. 1 Pa.C.S. § 1932. If they can be made to stand together[,] effect should be given to both as far as possible. In ascertaining legislative intent, statutory language is to be interpreted in context, with every statutory section read together and in conjunction with the remaining statutory language, and construed with reference to the entire statute as a whole. We must presume that in drafting the statute, the General Assembly intended the entire statute, including all of its provisions, to be effective. 1 Pa.C.S. § 1922. Importantly, this presumption requires that statutory sections are not to be construed in such a way that one section operates to nullify, exclude or cancel another, unless the statute expressly says so.

*Id.* at *6-7 (citations and internal quotation marks omitted).

Central to the arguments of the parties is the well-settled principle that, when official comments to statutes were before the legislature at the time of enactment and are appended to the statutory text, we may treat them as evidence of legislative intent. 1 Pa.C.S. § 1939; *see Bricklayers of W. Pa. Combined Funds, Inc. v. Scott's Dev. Co.*, 90 A.3d 682, 693 n.11 (Pa. 2014); *see also In re Martin Estate*, 74 A.2d 120, 122 (Pa. 1950). However, when the commentary conflicts with the text of the statute, the text must prevail. 1 Pa.C.S. § 1939; *see Taylor Trust*, 164 A.3d at 1159-60.

We first must address whether, when a statute is clear and unambiguous, it is inappropriate to consider the commentary to the rule, as the Superior Court did in this case. The parties provide limited focused argument on this point, but the underlying principles are straightforward.

Section 1939 provides in full:

The comments or report of the commission, committee, association or other entity which drafted a statute may be consulted in the construction or

application of the original provisions of the statute if such comments or report were published or otherwise generally available prior to the consideration of the statute by the General Assembly, *but the text of the statute shall control in the event of conflict between its text and such comments or report*.

1 Pa.C.S. § 1939 (emphasis added). Thus, on its face, Section 1939 contains no explicit caveat regarding the principle's application when the statutory language is unambiguous. However, as a matter of logic and by necessary implication, the answer must be that Section 1939 is relevant only when the statute is unclear.

As set forth in *Taylor Trust* and *Martin Estate*, we may not rely upon our various tools of statutory construction when the text of the statute, itself, is plain. In *Taylor Trust*, we acknowledged that Section 1939 contains no express limitation on its application to instances of ambiguity. We emphasized nonetheless that, "if the relevant statutory language is free of ambiguity, resort to [S]ection 1939 would be unnecessary." 164 A.3d at 1160 n.6. When a statute is unambiguous, the commentary can serve only to confirm the statute's import, rendering resort to the commentary redundant, or to contradict the statute's plain meaning, which is impermissible. Thus, when a court identifies a statute as unambiguous, any reference it makes to the commentary is gratuitous.

Turning to the effect of Section 7710.2 upon the law protecting pretermitted spouses, we have the benefit of thorough, erudite briefs from both parties. They examine the common law, the long evolution of the PEF Code, the introduction of uniform codes into Pennsylvania's statutory law, and the ramifications of the General Assembly's 2006 addition of Section 7710.2 to the Uniform Trust Code. While these analyses are illuminating, they prove too much, because the parties concur on a point that significantly simplifies the case. Specifically, the parties agree—correctly in our

view—that, at least until 2006, Sections 2203 and 2507 operated independently, such that Section 2507's pretermitted share applied only to the intestate estate commonly understood as excluding any property "not effectively disposed of by will *or otherwise*." *See* 20 Pa.C.S. § 2101(a).

Hence, *inter vivos* trusts, which are among assets "disposed of . . . otherwise," lay outside the reach of the intestate estate at least until the enactment of Section 7710.2. Before 2006, the only way a surviving spouse, pretermitted or otherwise, could reach *inter vivos* trusts or other property "disposed of . . . otherwise" was by choosing to take the statutory elective share instead of the pretermitted spousal share. *See* Brief for Wife at 28-29 ("The option to choose between taking an elective share or an intestate share is precisely what the legislature intended when it first codified Section 2507(3) in 1956 (though at that time the option to take an intestate share *did not extend to an* inter vivos *trust*). In 2006, the legislature *simply extended that option to an after-married spouse from a testamentary trust under will to an* inter vivos *trust as well*.") (emphasis added); Superior Court Brief for Wife at 17-18 (same); Brief for Children at 10 ("The Orphans' Court, the Superior Court and [Wife] agree that the rulings in this case applying Section 2507(3) to an *inter vivos* trust constitute a change in the statutory structure for decedents' spouses that has been in place for nearly 70 years."); *see also* O.C.O. at 10 ("In light of Section 7710.2 and the comments to this section, we perceive that our General Assembly intended to place revocable *inter vivos* trusts on an equal footing with testamentary instruments and afford pretermitted spouses with an opportunity to claim an intestate share of said trusts."); 20 Pa.C.S. § 2507, Jt. State Gov't Comm. Cmt.—1956 (noting that the 1917 Act's pretermitted

spouse and children provision is divided into separate parts in furtherance of clarity, and contrasting "[t]he Model Probate Code[, which] makes no provision for the after-married spouse because it is considered that his right to take [an elective share] against the will is a full protection. Pennsylvania places the after-married spouse in the more gracious position of receiving a full intestate share . . . without requiring that there be an election to take against the will."); *cf. id.* Jt. State Gov't Comm. Cmt.—1992 ("The spouse's right of election against the will is not affected [by amendments to Subsections 2507(2) and (3)] and would be the same regardless of whether the will was executed before or after the marriage.").[14]

The sole point of disagreement, then, concerns whether the General Assembly's enactment of Section 7710.2 was intended to change what long had been the *status quo* by extending the scope of a Subsection 2507(3) estate, defined by reference to an intestate estate, to encompass *inter vivos* trusts—this, despite the fact that such a trust is addressed textually only in Subsection 2203(a)(3). In addressing whether a given enactment changes pre-existing law, we proceed cautiously. "Statutes are never presumed to make any innovation in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions." *Rahn v. Hess*, 106 A.2d 461, 464 (Pa. 1954); *accord Everhart v. PMA Ins. Grp.*, 938 A.2d 301, 307

---

[14]  *See also* Roberta Rosenthal Kwall, Anthony J. Aiello, *The Superwill Debate: Opening the Pandora's Box?*, 62 TEMP. L. REV. 277, 297 (1989) (noting that historically "courts treating the claims of pretermitted heirs have not been particularly willing to void *inter vivos* transfers of assets in order to increase the pretermitted heir's intestate share"); *id.* at 300 (noting that pretermitted heirs, *i.e.*, non-spouses, do not have the same protection against disinheritance by *inter vivos* transfers that spouses do through the spousal election).

(Pa. 2007); *Carrozza v. Greenbaum*, 916 A.2d 553, 565-66 (Pa. 2007); *Commonwealth v. Miller*, 364 A.2d 886, 887 (Pa. 1976).

As a threshold matter, we disagree with the Superior Court to the extent that it found that the statutory provisions here at issue are unambiguous when read in their full context. Whether a statute is ambiguous cannot be determined in a vacuum.

> A statute is ambiguous when there are at least two reasonable interpretations of the text. In construing and giving effect to the text, "we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *Roethlein v. Portnoff Law Assoc.*, 81 A.3d 816, 822 (Pa. 2013) (citing *Mishoe v. Erie Ins. Co.*, 824 A.2d 1153, 1155 (Pa. 2003)); *accord Commonwealth v. Office of Open Records,* 103 A.3d 1276, 1285 (Pa. 2014) (party's argument that statutory language is ambiguous "depends upon improperly viewing it in isolation;" when language is properly read together and in conjunction with rest of statute, legislative intent is plain). The United States Supreme Court also takes a contextual approach in assessing statutes and in determining predicate ambiguity. *See generally King v. Burwell,* 135 S.Ct. 2480, 2489 (U.S. 2015) ("If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." (internal quotation marks and citations omitted)); *Yates v. United States,* 135 S.Ct. 1074, 1081-82 (U.S. 2015) ("Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words. Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.' Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." (internal citations omitted)).

*A.S. v. Pa. State Police*, 143 A.3d 896, 905-906 (Pa. 2016) (some citations omitted, others modified).

It is materially undisputed that Subsection 2507(3) is a rule of construction that imputes a will modification based upon the presumed intent of the testator, absent evidence to the contrary, not to disinherit a spouse or child whose arrival post-dated the

will's execution. One might reasonably read Section 7710.2 as introducing the rebuttable presumption established in Section 2507 into the context of *inter vivos* trusts. However, viewed in its full context, including Section 2203, which long has been recognized as providing protections for omitted spouses that are distinct from those provided for pretermitted spouses and which reach certain *inter vivos* transfers, it also is reasonable to conclude that the legislature omitted to mention *inter vivos* trusts in Subsection 2507(3) and the provisions incorporated therein for a reason, given that it specifically addresses them in Section 2203. Thus, there are competing, reasonable readings of the content and intended effect of Section 7710.2. Accordingly, we must rely upon the array of tools that we use to construe an ambiguous statute, including the commentary to Section 7710.2 pursuant to 1 Pa.C.S. § 1939.

Recognizing that the PEF Code is an elaborate machine with many moving parts, we begin by addressing whether Sections 2203 and 2507 must be read *in pari materia*. Children argue that each of those provisions reflects the legislature's intent to protect surviving spouses from disinheritance and hence must be harmonized. The Superior Court disagreed:

> In contrast to [Subs]ection 2507(3), the Section 2203 spousal election provision is not a rule of construction. The former is a construction applied in the absence of contrary intent to provide for a surviving spouse based on the presumption that a decedent did not intend to omit the surviving spouse from his or her testamentary decisions. The latter is a right of a surviving spouse available notwithstanding any contrary intent of the decedent to protect against disinheritance. In recognition of the "functional equivalence" between *inter vivos* trusts and testamentary dispositions, the [l]egislature in adopting Section 7710.2 merely sought to impose consistency on the construction of such instruments. Accordingly, there is little reason to treat a decedent's presumed intent differently when considering his will or his *inter vivos* trust. The fact that surviving spouses retain other rights independent of that intent is irrelevant. Therefore, it is

> unnecessary to read Section 7710.2 *in pari materia* with Section 2203, because they relate to different concerns.

*Kulig Trust*, 131 A.3d at 500. In effect, the court read Sections 2507 and 7710.2 in the abstract, finding them concerned only with matters of will interpretation independent of the import or practical effect of their provisions, while Section 2203 serves an entirely separate function simply because its remedial spousal protections are predicated on fundamentally equitable concerns without regard to the decedent's intent. We find that the Superior Court's approach to distinguishing the intent and effect of Sections 2203 and 2507 is cramped, lacking both formal and practical support.

Both sections reflect modern embodiments of centuries-old protections designed to ensure that surviving spouses are not left destitute by their departed spouses by design or neglect. *See Schwartz' Estate*, 295 A.2d at 602 ("The obvious philosophy of [the spousal election provision in the Estates Act of 1947] . . . is to prevent a husband from indirectly disinheriting his wife through an *inter vivos* transfer while retaining control over the use and enjoyment of the property during his lifetime."); *In re Huested's Estate*, 169 A.2d 57, 61 (Pa. 1961) ("The mischief to be remedied and the reason for the [1947 revision] are clear. Wives were being very unfairly deprived of a share in their husband's personal property by a transparent trust device which permitted a husband to retain control of his property, and at the same time legally deprive his wife of her just marital rights therein."); *Pengelly's Estate*, 97 A.2d at 849 (same); *Appeal of Fid. Ins., Tr. & Safe-Deposit Co.*, 15 A. 484, 486 (Pa. 1888) (identifying predecessor provision to modern pretermitted spousal share as intended to "provide against the improvidence of husbands who should neglect to alter their wills in accordance with the changed circumstances caused by subsequent marriage"); *In re Estate of Long*, 600 A.2d 619,

621 (Pa. Super. 1992) ("The most obvious purpose behind [Subs]ection 2507(3) is to protect a surviving spouse from the negligence of the decedent in failing to update his will after marriage. The statute makes a presumption that had the decedent thought about it, or had a chance, he would have provided for his current spouse."). Albeit by different means, Sections 2203 and 2507 serve to protect surviving spouses from disinheritance and destitution when the decedent has made no provision or insufficient accommodation under the terms of his will or by the arrangement of his financial affairs. Given this substantive complementarity of these provisions, they must be interpreted *in pari materia*, both with respect to each other and against Section 7710.2, given the lower courts' and Wife's broad reading of the latter provision in effect to modify the previously-understood import of one or both of the former provisions.

In interpreting these statutes, we also must consider "the object to be attained" by the statute; "the former law, if any, including other statutes upon the same or similar subjects"; and "the consequences of a particular interpretation." 1 Pa.C.S. § 1921. In doing so, we presume that the General Assembly does not intend an absurd or unreasonable result and that the legislature intends that all provisions have effect. 1 Pa.C.S. § 1922.

We begin with what is undisputed: Nothing in the text of Section 7710.2 or the commentary thereto expresses any specific legislative intent to change the pre-2006 framework for providing for pretermitted spouses and spouses otherwise deprived of the legislatively-determined minimum share of the deceased spouse's assets reflected in Section 2203's formula. Notably, the commentary to another Uniform Trust Code section clearly indicates the legislature's intention to disturb prior law on other topics.

*See* 20 Pa.C.S. § 7752 (providing in the 2005 Joint State Government Committee Comment that "subsection (a) reverses prior Pennsylvania law and presumes that a trust created after the effective date of this chapter is revocable unless the trust instrument provides that it shall not be," in direct contradiction of prior law recognized in *Biggins v. Shore*, 565 A.2d 737, 747-48 (Pa. 1989)). Nor is this uncommon; the legislature knows well how to signal its intention to change prior law. *See Lower Makefield Twp. v. Lands of Chester Dalgewicz*, 67 A.3d 772, 776 (Pa. 2013) (finding intent in Joint State Government Commission Comments to an Eminent Domain Code provision to "change existing law" in a way that abrogated prior precedent, and concluding that further reliance upon that precedent would be misplaced). Yet, no such indication appears on the face of, or in the commentary to, Section 7710.2.

It also is noteworthy that the language employed by Section 7710.2 is consistent with prior precedent, suggesting a codification, rather than a modification, of long-standing interpretive law. In *Matter of Tracy*, 346 A.2d 750 (Pa. 1975), this Court held that "[t]he principles applicable to the construction of trust instruments are essentially the same as those used in the construction of wills." *Id.* at 752; *cf.* 20 Pa.C.S. § 7710.2 ("The rules of construction that apply in this Commonwealth to the provisions of testamentary trusts also apply as appropriate to the provisions of inter vivos trusts."). Wife somewhat confusingly contends that *Tracy* supports her own argument in establishing that wills and trusts should be interpreted utilizing the same principles such that Section 7710.2, indeed, codified that principle, which contradicts her acknowledgment that, before the enactment of Section 7710.2, she would have had no claim to a pretermitted spousal share of the Trust. The text of Section 7710.2

specifically speaks in terms of interpreting the "provisions" of wills and trusts, suggesting that, as in *Tracy*, it intends only that interpretive principles that apply to aid courts in inferring testamentary intent from testamentary language that is less than clear should also be employed in aiding courts in discerning a settlor's intent in establishing a trust.

That being said, the commentary to Section 7710.2 complicates this reference to "provisions" in drawing a distinction between "constructional preferences" and "rules of construction." The former, the commentary suggests, are "general in nature," tools for resolving ambiguities of intention, while the latter "are specific in nature, providing guidance for resolving specific situations or construing specific terms. Unlike a constructional preference, a rule of construction, when applicable, can lead to only one result." 20 Pa.C.S. § 7710.2, ULC (citing RESTATEMENT (THIRD) OF PROPERTY: DONATIVE TRANSFERS § 11.3 & cmt. b (Tentative Draft No. 1, approved 1996) (proposing a distinction between constructional preferences and rules of construction)).

Nonetheless, in all of this, the closest thing Children can identify to an affirmative indication of legislative intent substantially to change the undisputed pre-2006 *status quo* is the commentary's general acknowledgment that revocable trusts commonly are used as an alternative to probate. Courts and legislatures long have recognized that trusts may be used in this fashion. Indeed, we addressed the phenomenon as long ago as 1887. *See Dickerson's Appeal*, 8 A. 64 (Pa. 1887) (denying widow access by election to revocable *inter vivos* trusts as to which decedent exercised a power of revocation); *see also Beirne v. Continental-Equitable Tr. Co.*, 161 A. 721 (Pa. 1932) (same under circumstances where decedent utilized a revocable *inter vivos* trust to disinherit wife). In 1947, moreover, the General Assembly amended Section 11 of the

Estates Act, thereafter entitling a spouse to elect against assets conveyed *inter vivos* by the decedent when he "retain[ed] a power of appointment by will, or a power of revocation or consumption over the principal thereof." In commentary to the amendment, the legislature noted that, before this amendment, "Pennsylvania ha[d] given little opportunity to the surviving spouse to share when legal title ha[d] passed from the decedent prior to death," and added that "it was stated correctly that 'It is only the stupid husband who, against his wishes, would be forced to allow his wife to share in his personalty.'" Act of April 24, 1947, P.L. 100, § 11, Cmt., codified at 20 P.S. § 301.11 (repealed) (quoting *Comment*, 5 U. PITT. L. REV. 78, 87 (1939)). Finally, for evidence that the General Assembly long has been aware of such maneuvers, one need look no farther than Section 2203 itself. With its lengthy enumeration of categories of non-probate assets subject to the spousal election,[15] Section 2203 long

---

[15] Section 2203 entitles a spouse to claim against "[p]roperty passing from the decedent by will or intestacy" as well as the following assets:

> (2) Income or use for the remaining life of the spouse of property conveyed by the decedent during the marriage to the extent that the decedent at the time of his death had the use of the property or an interest in or power to withdraw the income thereof.

> (3) Property conveyed by the decedent during his lifetime to the extent that the decedent at the time of his death had a power to revoke the conveyance or to consume, invade or dispose of the principal for his own benefit.

> (4) Property conveyed by the decedent during the marriage to himself and another or others with right of survivorship to the extent of any interest in the property that the decedent had the power at the time of his death unilaterally to convey absolutely or in fee.

> (5) Survivorship rights conveyed to a beneficiary of an annuity contract to the extent it was purchased by the decedent during the marriage and the

(continued…)

has been understood as a hedge against attempts to park assets outside the probate context in an effort to disinherit or shortchange a spouse. *See Schwartz' Estate*; *Pengelly's Estate*, *supra*. Any argument that depends upon the premise that the General Assembly failed until 2006 to consider how best to care for surviving spouses subject to attempts by their decedent spouses to disinherit them with financial chicanery pales before this legacy of judicial decisions and legislative enactments endeavoring to deal equitably with precisely such situations. In short, we hardly could ask for *more* evidence that the General Assembly long has understood the import and effect of Sections 2203 and 2507, and has remained unperturbed by it. In light of this ineluctable inference, the fact that the legislature declined expressly to identify the effect that Wife imputes to Section 7710.2 provides powerful evidence that the General Assembly did not intend it.

The broader consequences and questions implicated by Wife's approach, consequences the lower courts neglected to consider, further chip away at the lower

---

(…continued)

decedent was receiving annuity payments therefrom at the time of his death.

(6) Property conveyed by the decedent during the marriage and within one year of his death to the extent that the aggregate amount so conveyed to each done exceeds $3,000, valued at the time of conveyance.

In construing this subsection, a power in the decedent to withdraw income or principal, or a power in any person whose interest is not adverse to the decedent to distribute to or use for the benefit of the decedent any income or principal, shall be deemed to be a power in the decedent to withdraw so much of the income or principal as is subject to such power, even though such income or principal may be distributed only for support or other particular purpose or only in limited periodic amounts.

20 Pa.C.S. § 2203(a).

courts' rulings. Because the lower courts' and Wife's interpretation of Section 7710.2 relies solely upon the importation of Section 2507's rule of construction into a court's reading of an *inter vivos* trust the share due a pretermitted spouse, it necessarily excludes pretermitted spousal share access to the other categories of assets delineated by Section 2203. Thus, while a pretermitted spouse would be entitled to include an *inter vivos* trust in the pretermitted spousal share, she could not do so with property conveyed by the decedent to others with a right of survivorship, such as payable-on-death or transferable-on-death accounts, annuities, and so on. Thus, Wife's account requires us to infer the addition of one financial device a decedent might have employed to isolate assets from his spouse while excluding numerous other devices that might be employed to the same end.[16] In short, if a Decedent aimed to force a spouse into selecting a one-third elective share instead of a one-half pretermitted spousal share, he need only place his assets in any of several non-trust assets that remain available to an omitted spouse only through the one-third elective share. This is an unreasonable, if not absurd, result to the extent that Wife's argument depends upon us finding in Section 7710.2 evidence of legislative intent to increase a pretermitted spouse's access to decedent's will substitutes generally.

Nor does this exhaust the problematic implications of the Superior Court's and Wife's account. Notably, the ULC states that Section 7710.2 "is patterned after Restatement (Third) of Trusts Section 25(2) and comment e (Tentative Draft No. 1,

---

[16] *See* Marcus, *supra* n.11, at 864-65 (identifying four main types of "will substitutes": life insurance policies, pensions, revocable living trusts, and multiple-party or joint accounts, all of which are substantially recognized as subject to the elective share under Section 2203, and only one of which would be imported into the pretermitted spousal share under the lower courts' account of Section 7710.2).

approved 1996), although this section, unlike the Restatement, *also applies to irrevocable trusts*." 20 Pa.C.S. § 7710.2, ULC (emphasis added). Thus, taking the commentary at face value, as the lower courts did in every other regard, their reasoning would appear also to apply to irrevocable trusts, including charitable ones, subjecting the corpora of such trusts to the pretermitted spousal share. The consequences of such a ruling upon, *e.g.*, charitable trusts and trusts designated for the care of disabled dependents need not be detailed here as they are self-evident. In effect, Wife's argument simultaneously is underinclusive, in leaving readily-available avenues for a testator to inflict the harm Wife would have us find that Section 7710.2 sought *sub silentio* to prevent, and overinclusive in threatening heretofore sacrosanct irrevocable *inter vivos* trusts.[17]

If we understand correctly, Wife would take considerably more through pretermission than she would through election if her view were to prevail. *See supra* n.9. Implicit in Wife's view is that to deny her these assets is fundamentally unfair and contrary to the General Assembly's intent in enacting Section 7710.2. But Wife does not dispute that she would have had no such pretermitted spousal claim to the *inter*

---

[17] Children argue that this potential consequence of the lower court's decisions would confound the General Assembly's prior intent to preclude precisely this result. In *In re Estate of Behan*, 160 A.2d 209 (Pa. 1960), this Court held that the spouse may elect against an irrevocable charitable trust based solely upon the decedent settlor's retention of a testamentary power of appointment of the trust to a charitable trust or foundation. In 1978, in enacting Chapter 22 of the PEF Code as presently worded, the General Assembly effectively abrogated *Behan's Estate* by allowing election only against *inter vivos* trusts as to which the decedent had retained the lifetime power to revoke or to consume or dispose of the principal *for his own benefit*. Children further note that this would be in derogation of our canon of construction directing in case of ambiguity that we presume "[t]hat the General Assembly intends to favor the public interest as against any private interest." *See* Brief for Children at 47-48.

*vivos* trust under the pre-2006 law, which prevailed in materially the same form for sixty years and was implicitly reaffirmed each time the Legislature revisited the PEF Code without modifying this aspect of the Code's operation. Nor does she account for the methods that a decedent might apply to effectuate the same end that are unaffected by her proposed reading of Section 7710.2.

The law is clear that the General Assembly "has the power to enact all manner of legislation with respect to wills and trusts subject, of course, to the rights and limitations ordained in the Constitution of the United States and the Constitution of Pennsylvania," neither of which are implicated in this case. *In re Scott*, 211 A.2d 429, 431 (Pa. 1965). We read the interplay of Sections 2203 and 2507 as reflecting a two-tiered system to protect any spouse from being entirely or substantially excluded from receiving the benefit of her deceased spouse's assets. In the innocuous circumstance, pretermission, in which there is no sign that the decedent intended to exclude the spouse whom he married after executing the operative will, our long-standing common law and codifying statutory law direct that we impute to the decedent an unmemorialized intent to include that spouse. Our legislature has determined that the contours of that presumed intent should be those embodied in the law governing intestacy.

Conversely, where a decedent has, during his lifetime, shifted substantial assets outside the reach of probate, such that one half of the would-be intestate estate that remains has less value than one third of the assets comprising the alternative elective share (including the probate estate, itself, it bears noting[18]), nothing about the governing

---

[18]    Given the range of assets subject to election that are excluded from the pretermitted spousal share, there will be circumstances not involving *inter vivos* trusts (continued…)

statute suggests a parallel assumption. Indeed, Section 2203 effectively starts from the premise that the decedent *intended to disinherit* his spouse, or at least deliberately secreted assets outside probate indifferently to his spouse's interests. Thus, Section 2203 exclusively embodies a policy determination that a surviving spouse should enjoy no less than one third of the enumerated assets, defined in a way that captures all or most of the decedent's assets more effectively than does the pretermitted spousal share. That this reflects a legislatively-defined minimum share for the spouse is evident in the fact that, unlike the pretermitted spousal share, the elective share is subject to offsets for assets already received by the spouse, which serve to ensure that the electing spouse receives precisely that legislatively-defined minimum share and nothing more.

Regardless of the advisability of this approach, reading the PEF Code as a whole in this fashion provides a plausible explanation for the fact that the shares differ in some particulars—an explanation that recognizes the preservation of the same remedial ends. Against this backdrop, we cannot reasonably infer from the General Assembly's enactment of Section 7710.2 that the provision was intended to substantially revise this long-standing distributive scheme absent clear indications to that effect. It is a necessary corollary of judicial reluctance to intrude upon legislative prerogatives that we will find legislative intent to effectuate a substantial change to time-honored legal principles only when it is expressed clearly and unmistakably or, at least, follows by

---

(…continued)
whereunder the elective share is more lucrative than the pretermitted spousal share, and this would be true even if we affirmed the Superior Court's decision, given the many other non-probate assets subject to election.

necessary implication from the statutory text. Neither Wife nor the lower courts have satisfied that stringent standard.

Accordingly, we reverse the Superior Court's order affirming the Orphans' Court's decree declaring that the Trust should be considered to be part of the pretermitted spousal share under the circumstances presented, and we remand for proceedings consistent with this Opinion.

Justices Todd and Dougherty join the opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Baer joins.

Justices Donohue and Mundy did not participate in the consideration or decision of this case.